[Cite as *State v. Rollison*, 2010-Ohio-2162.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,               CASE NO.  9-09-51

    v.

RYAN R. ROLLISON,              O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 09 CR 0079

**Judgment Affirmed**

**Date of Decision:  May 17, 2010**

APPEARANCES:

    *Kevin P. Collins*  for Appellant

    *Angela C. Kloha*  for Appellee

**PRESTON, J.**

{¶1} Defendant-appellant, Ryan R. Rollison (hereinafter "Rollison"), appeals the judgment of conviction and sentence entered against him by the Marion County Court of Common Pleas. For the reasons that follow, we affirm.

{¶2} This case stems from the events that took place around February 21-22, 2009, when allegedly Rollison and another individual, Edward Large Jr. (hereinafter "Eddie"), stole Ryan Drake's laptop, DVDs, cell phone, and hookah from his apartment at 328½ North State Street, Marion, Ohio. On March 5, 2009, the Marion County Grand Jury indicted Rollison on one count of Burglary in violation of R.C. 2911.12(A)(2), a felony of the second degree. On August 6, 2009, the Marion County Grand Jury additionally indicted Rollison on one count of Intimidation of an Attorney, Victim, or Witness in a Criminal Case in violation of R.C. 2921.04(B), a felony of the third degree.

{¶3} A jury trial commenced on November 3-4, 2009, and the following evidence was presented. Ryan Drake (hereinafter "Ryan") testified via video deposition that he and his brother, David Ben Drake (hereinafter "Ben"), who lived with Ryan at 328½ North State Street, decided to have a party on the night of February 21, 2009. (Drake Depo. at 8). The party started around 7:30 p.m., they had about ten to twelve people over, and most everyone was drinking alcohol. (Drake Depo. at 45-47). In particular, Ryan had four or five shots of 151 Rum and

four or five shots of some other alcoholic drink that he could not remember, and he acknowledged that he had been drunk that night. (Drake Depo. at 45).

{¶4} Ryan stated he and his brother had invited their downstairs neighbor, James Large (a.k.a. Bobby Sloan)(hereinafter "Bobby"), and that Bobby showed up to the party around 9:00 p.m., left the party at some point in the evening, and later came back to the party around 11:00 p.m., this time accompanied with Rollison and Eddie. (Id. at 9-11). After drinking with Eddie, Rollison, and Bobby for a little while, Ryan said that he asked them to leave so he could go to bed. (Id. at 12). When he went back into the bathroom to drink some more, he heard a commotion, went back into the kitchen to see what was happening, and got hit by Bobby. (Id.). After getting punched, Ryan went into the bathroom, while Ben called the police. (Drake Depo. at 14). Ryan said that after the police arrived, he was taken to the hospital by an ambulance, where he was later joined by Ben and Ben's girlfriend, Amy Wolfe. (Id.). They stayed at the hospital for a few hours. (Id.).

{¶5} Officer Keith Cox with the Marion City Police Department responded to the call regarding a possible assault at 328½ North State Street around 10:34 p.m. (Nov. 3, 2009 Tr. at 122). When he arrived at the scene, Officer Cox talked to Ben and then went and found Ryan in the bathroom. (Id.). Officer Cox said that Ryan's mouth was bleeding and that he was clearly

intoxicated. (Id. at 124, 130). After Ryan was transported to the hospital, Officer Cox spoke to three or four people who were still there from the party. (Nov. 3, 2009 Tr. at 122-23). Officer Cox said that he was at the scene for about 35-40 minutes, that he had been the last officer at the scene, and that he had waited until the last person, Jonathan LaRue, was picked up by a friend. (Id. at 125). While he had been at the scene, Officer Cox said that he took pictures of Jonathan's injuries and of the outside of the house. (Id. at 126); (State's Ex. 17). Moreover, Officer Cox testified that to the best of his knowledge the apartment was "all locked up" when he left; however, he further stated, "I don't recall if I would have, you know, actually grabbed the handle and shook the door, anything like that, but standard procedure [sic] to tell people, you know 'maybe you should make sure your house is secure.'" (Nov. 3, 2009 Tr. at 125). Nevertheless, Officer Cox believed that the lights had been out at the house when he had left the scene around 11:25 p.m. (Id. at 126-29).

{¶6} When Ryan, Ben, and Amy returned from the hospital a few hours later, Ryan said that the apartment door was open and the lights were on. (Drake Depo. at 18). When they walked into the apartment Ryan said that he saw one of Ben's black bags sitting next to the front door, and that Rollison came out from the hallway carrying a VCR under his arm and asked them where everyone had gone. (Drake Depo. at 18). Despite Rollison's and Eddie's presence, Ryan said that he

went to the couch and sat down, stating "I was really out of it, so I sat down and texted my friend Kara and told her to come over so I could have someone to talk to." (Drake Depo. at 19, 42). Nevertheless, Ryan said that he noticed that his laptop, DVDs, hookah, and cell phone were all missing when he got back to the apartment. (Drake Depo. at 19, 30, 67-68). Ryan never saw Rollison or Eddie with any of those items, and Ryan said that the items were never recovered. (Id.).

{¶7} Ryan's brother, Ben, also testified about the events that night, and while he did not personally close up the apartment, he believed that one of the police officers had shut off the lights, checked the door to see if it was locked, and helped Ben put Ryan into his girlfriend's truck to take to the hospital. (Nov. 3, 2009 Tr. at 182-83). When he, Amy, and Ryan got back from the hospital, Ben immediately noticed that the apartment door was open and that the lights were on, and when they went upstairs to check, Ben saw a black bag with his headphones and microphone by the front door. (Id. at 184). Ben said that these items had been previously in the bathroom before they had left for the hospital. (Id.). In addition, Ben said that all of the cushions to the couches and chairs had been pulled out and that there was stuff thrown about the apartment and knocked over, and that the apartment had not looked this way prior to them leaving for the hospital. (Id. at 186); (State's Ex. 9). When they entered the apartment, Ben said that Rollison came out from the bathroom and Eddie came out from the living room, and that

Rollison informed them "that he was making sure things were ok and it looked like someone had ran through their house." (Id. at 188). Ben said that he signaled to Amy to call the police, and soon afterwards, Rollison and Eddie left the apartment and went downstairs to Carrie Grigsby's apartment. (Id. at 190). Ben said that not only was everything in their apartment "out of order" and "messed up," but he discovered that Ryan's hookah, DVDs, and laptop, which had a special camouflage skin on it, were missing. (Id. at 187-89). On cross-examination, Ben acknowledged that Ryan had been pretty drunk that night, and that although he had played a game of beer pong, Ben testified that he had not been intoxicated that night. (Id. at 192, 201).

{¶8} Ben's girlfriend, Amy Wolfe, testified that on February 21, 2009, she received a phone call from Ben telling her that there had been a fight at the apartment, that Ryan was being taken to the hospital, and could she pick him up and take him out to the hospital. (Nov. 4, 2009 Tr. at 257). Amy said that she picked up Ben and that they were all at the hospital a couple of hours. (Id. at 258). When they all got back to the apartment, she said that the apartment door was open, the lights were on, and when they all walked upstairs, she saw a bag sitting by the front door that was full of Ben's stuff. (Id. at 258-59). At that moment, two guys walked out, and Ben told her to go call the police, so Amy went downstairs and called the police, and as she was doing so, she saw the two guys

from the apartment run down the stairs into the downstairs apartment and shut all of the lights off. (Id. at 259-60). On cross-examination, Amy said that when she picked up Ben to go to the hospital, the police were still there along with another guy who was waiting for a ride. (Id. at 261). She asked Ben whether they should go upstairs, but Ben told her that the police would take care of the doors and lights. (Id. at 261-62).

{¶9} One of the Drakes' friends, Jonathan LaRue, testified that he had been at the party that night. (Nov. 4, 2009 Tr. at 231). Jonathan said that everyone had been listening to music, socializing, and having a good time until one of the guys at the party started calling Jonathan a thief and punched him, causing a fight to break out. (Id. at 233-35). Everyone, except Ben, Ryan, Jonathan, and another friend named Danny, left the party before the police arrived, and that when the police came everyone remaining at the apartment moved outside and gave statements to the police. (Id. at 235-36). Jonathan said that while he could not remember whether the lights in the apartment had been on and whether the door had been shut when he left, he said that he had been one of the last people to leave, and that another police officer waited with him until his ride came to pick him up. (Id. at 237, 239-40).

{¶10} Marion City Police Officer Michael Woods was the first officer to arrive on the scene in response to an alleged burglary dispatch. (Nov. 4, 2009 Tr.

at 212-13). He first spoke to Ben and Amy, and while he was standing in the front of the apartment, he was approached by Rollison. (Id.). Officer Woods stated, "[h]e came from the downstairs apartment and basically asked why we were there, what was going on, and basically told 'em we were investigating a burglary." (Id. at 213). He and Officer Baldridge then escorted Rollison to a police cruiser, and Officer Woods went looking for Eddie, who he found hiding in Carrie Grigsby's closet. (Id. at 214). Officer Woods then testified that he had recorded Rollison's interview taken at the police station, and acknowledged that Rollison always maintained his innocence. (Id. at 216-19).

{¶11} Marion City Police Officer Matt Baldridge also responded to the scene and testified that while he was at the scene he looked for the missing items at Carrie Grigsby's apartment, but the items were never recovered. (Nov. 3, 2009 Tr. at 134, 139, 147). He also placed Rollison in the back of his police cruiser and recorded their conversation and the additional conversations Rollison had while he had been in the back of the cruiser. (Id. at 143); (State's Ex. 18). In particular, Rollison can be heard making a phone call to his mother, and in addition to using a number of expletives, he told his mother to tell the police that they had left the house about a half hour ago if the police ever called her. (State's Ex. 18). Nevertheless, Officer Baldridge stated that he never saw Rollison with any of the

missing items, they were never able to recover any of the missing items, and that Rollison maintained his innocence the entire time. (Id. at 146-49).

**{¶12}** Marion City Police Officer Shane Gosnell testified that he had been the officer that had processed the scene at 328 ½ North State Street. (Nov. 3, 2009 Tr. at 155-56). In particular, he took several photographs evidencing the condition of the apartment, and although he never found any, Officer Gosnell tried to determine if there were any identifiable fingerprints on the VCR allegedly carried by Rollison and that had been left in the apartment. (Id. at 163-65); (State's Exs. 1-16).

**{¶13}** Carrie Grigsby also testified that at the time of the incident she lived in the downstairs apartment. (Nov. 4, 2009 Tr. at 220). Carrie said that she had been at the hospital earlier that evening for an ear ache, but that when she got back to her apartment she saw Ryan being taken away in an ambulance and learned that Bobby had been arrested for assault. (Id. at 221). Later that evening, she left her apartment again, but came back after getting in a fight with her boyfriend, and when she got home she saw Eddie walking down the stairs from the upstairs apartment along with Rollison who was carrying something that looked like a notebook under his arm and that it was "camouflaged." (Id. at 224-25).

**{¶14}** A neighbor, Steve Erwin, Jr., who lived across the street from the Drakes and Carrie Grigsby, said that he had been at the party drinking until Bobby

started hitting people, at which point Steve said he left and went back home. (Nov. 4, 2009 Tr. at 251-52). Later that evening, he said that he saw Rollison and Eddie go upstairs and come out with some "stuff," and although he could not tell what the stuff was Steve said that they carried it into Carrie Grigsby's apartment. (Id. at 252-53). On cross-examination, Steve admitted that he had had about 6-8 beers that night, but he stated that the upstairs apartment had been dark prior to Rollison and Eddie coming out from the apartment. (Id. at 254-55).

{¶15} Finally, Eddie Large testified for the State, and admitted that he had been in the Drakes' apartment that night: once for the party, and two times when everyone had been gone and he had been up there taking stuff. (Nov. 4, 2009 Tr. at 243-44). Eddie admitted that he never received permission to be in the Drakes' apartment and admitted to removing all of the missing items. (Id. at 246). Despite Eddie's admission, Eddie stated that Rollison had not been there when he had taken the missing items, which he said he had done his first time up to the apartment after the Drakes had left. (Id. at 246). Eddie stated that Rollison had been with him the second time he had been in the apartment after the party, but only because he had heard that there was a guy who was still sick up in the apartment and Rollison went up with Eddie to check on him. (Id. at 247). Eddie acknowledged that as a result of the incident, he had pled guilty to burglary and had been sentenced to five years imprisonment. (Id. at 249).

{¶16} The State then rested, and the defense presented testimony from three individuals who all knew Rollison: Virgil ("Barry") Workman, Scott Sponenberg, and David Jackson. They all testified that on February 21-22, 2009, a little after midnight, they had been playing pool at Whitey's when they learned of a party going on at 328½ North State Street. (Nov. 4, 2009 Tr. at 268-69, 272-74, 277). When they got to the address, they each stated that the lights were on upstairs and that there were people up there partying, but because of the type of partying that was going on up there, they all decided to leave. (Id. at 269, 274, 278). Moreover, Dawnielle Henman, Rollison's niece and Bobby's wife, testified that she had been at Carrie Grigsby's apartment that night, and that although she had been invited to the party, she never went upstairs. (Id. at 283). After her husband Bobby had been arrested for the fight, Dawnielle testified that the party continued upstairs and that there were people running around until the police showed up the second time. (Id. at 284).

{¶17} Finally, Rollison testified. Rollison said that he had gone up to the party with Bobby that night around 8:30 p.m. to 9:00 p.m. (Nov. 4, 2009 Tr. at 290-95). He said that when he arrived there were several people playing beer pong, there was all kinds of alcohol, and the people at the party were intoxicated. (Id.). Later in the evening, Rollison left to meet Eddie and they went back to the party. (Id.). Then he and Eddie left again around 10:00 p.m. with Ryan's brother,

Ben, and they all went to a local carryout where Ben bought Rollison cigarallos. (Id). Rollison testified that he left the party once again when Bobby started hitting people and went downstairs to Carrie Grigsby's apartment. (Id.). Soon after the fight, Rollison said that the police arrived around 10:00 p.m. to 11:00 p.m. and that he later passed out downstairs in Carrie's apartment. (Id.). Nevertheless, Rollison admitted that he had been in the Drakes' apartment one more time that night, and he explained as follows:

> **There was - - there was a guy there standing on the - - the landing right out front of the door and he was puking off the banister. And I had went in, me and Eddie had went in because my sister has woke me up and told me that my dad wanted me to go up there and get this guy before he fell off. So me and Eddie went up there and there was nobody there. I couldn't get the guy to go inside. So we walked into the house, Eddie went back towards the bathroom, I went to the living room. Well, there was nobody in there. So we turned around and we was leaving as the people that went to the hospital, which was Ryan and Ben Drake and the girl, I'm not sure what her name was, but they walked in. We stood there and had talked to 'em for several minutes, asked 'em how they was doing, made sure everything was - - made sure he was alright, and we left. There was nothing ever said about anything taken or anything like that.**

(Id. at 294-95). Rollison said that the front door had been opened when he went upstairs to check on the guy who had been standing on the landing puking over the side of the banister. (Id. at 296). Furthermore, Rollison denied taking any of the missing items and said that he never saw Eddie take any of the missing items either. (Id. at 298-99). Moreover, Rollison said that the apartment had not been

really clean when he had been up there and that the fight had caused a lot of things to end up all over the place. (Id. at 304). Rollison admitted to calling his mother that night, acting belligerent towards her, and getting a "little angry" with her, and that he felt bad for the way he had treated her. (Id. at 306-07, 313). Finally, Rollison stated that he was 24-years-old and admitted to having several theft convictions, including two felonies for receiving stolen property and forgery. (Id. at 308-09).

{¶18} After the defense rested, closing arguments and instructions were given to the jury, and after deliberation, the jury found Rollison guilty on the Burglary offense in count one, but not guilty on the Intimidation of an Attorney, Victim, or Witness offense in count two. A sentencing hearing was held on December 1, 2009, and the trial court sentenced Rollison to a term of six (6) years in prison, and ordered Rollison to pay restitution in the amount of $1,470, jointly with co-defendant, Eddie. Additionally, the trial court imposed a mandatory term of three years of post release control.

{¶19} Rollison now appeals and raises six assignments of error.

**ASSIGNMENT OF ERROR NO. I**

**DEFENDANT-APPELLANT'S CONVICTION FOR BURGLARY IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶20} In his first assignment of error, Rollison argues that his burglary conviction was against the manifest weight of the evidence. Specifically, he claims that the jury lost its way in finding that he had committed a trespass by "force, stealth, or deception," and that he had entered the apartment with a purpose to commit a criminal offense.

{¶21} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'[weigh] the evidence and all reasonable inferences, consider the credibility of witnesses and [determine] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins* (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541, quoting *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717. A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass* (1967), 10 Ohio St.2d 230, 231, 227 N.E.2d 212.

{¶22} Here, Rollison was convicted of second degree burglary, which is prescribed in R.C. 2911.12(A)(2) as follows:

> **(A) No person, by force, stealth, or deception, shall do any of the following:**

**(2)   Trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense.**

Overall, Rollison claims that his conviction is against the manifest weight of the evidence with respect to two elements of the offense: (1) the commission of a trespass by "force, stealth, or deception," and (2) proof of purpose to commit a criminal offense.

{¶23} With respect to the element of "force, stealth, or deception," Rollison argues that the State only presented speculative evidence that Rollison had entered the apartment by force, stealth, or deception. We disagree. "Force" is defined under R.C. 2901.01(A) as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Moreover, it is well established in Ohio that the act of opening a closed but an unlocked door is sufficient to establish the "force" requirement. *State v. Harris*, 8th Dist. No. 90699, 2008-Ohio-5873, ¶24, quoting *State v. Austin*, 2nd Dist. No. 20445, 2005-Ohio-1035, ¶17, overruled on other grounds by *In re Ohio Criminal Sentencing Statute Cases*, 109 Ohio St.3d 313, 2006-Ohio-2109, 847 N.E.2d 1174. Here, there was some evidence that the apartment door had been shut and that the lights were off prior to the Drakes returning from the hospital. While Officer Cox could not recall whether he had grabbed the handle of the front door to check to see if it

had been locked, to the best of his knowledge the house had been all locked up and the lights had been turned off when he had left. In fact, Officer Cox testified that when he had been standing outside with Jonathan LaRue waiting for his ride to come, he had taken two pictures of the house (State's Exhibit 17), which illustrate that there are no lights on upstairs and that the front door was shut. Moreover, it is undisputed that Rollison was found inside the Drakes' apartment when they came home from the hospital.

{¶24} Nevertheless, we acknowledge that Rollison and Rollison's witnesses' testified that the party had never really stopped after the Drakes had left for the hospital, implying that the apartment had not been locked up and that the front door had been open for anyone to enter. However, there is contradictory evidence that was introduced that the party had ceased after the Drakes left for the hospital. Officer Cox and Jonathan LaRue testified that they were one of the last people to leave after Ryan was taken to the hospital, and Carrie Grigsby and Steve Erwin, Jr. testified that after the fight that night, the Drakes' apartment had been dark and quiet. Overall, despite the testimony from Rollison's witnesses stating that the party had started back up after the Drakes had left to the hospital, there was still some evidence that the party had ceased and the door had been shut prior to the Drakes returning from the hospital. Clearly, the jury chose to believe the testimony of the State's witnesses over that of Rollison's witnesses, and this fact

alone does not establish that the jury clearly lost its way in finding that Rollison had by "force, stealth, or deception" trespassed into the Drakes' apartment.

{¶25} With respect to the other element at issue, Rollison claims that the jury lost its way in finding that he had entered the apartment "with a purpose to commit a criminal offense." Rollison argues that the purpose to commit a criminal offense cannot be established merely based on his presence in the apartment when the Drakes returned from the hospital. Generally, the intent of a person cannot be proven by the direct testimony of a third person, rather it must be gathered from the surrounding facts and circumstances of the particular case. *State v. Johnson* (1978), 56 Ohio St.2d 35, 381 N.E.2d 637, quoting *State v. Huffman* (1936), 131 Ohio St. 27, 1 N.E.2d 313. However, where a defendant is apprehended within a structure that he has forcibly entered, there is a reasonable inference that he did so with the intent to commit a theft offense in the absence of circumstances giving rise to a different inference. *State v. Flowers* (1984), 16 Ohio App.3d 313, 315, 475 N.E.2d 790, overruled on other grounds by *State v. Fontes* (2000), 87 Ohio St.3d 527, 721 N.E.2d 1037.

{¶26} Despite his presence in the Drakes' apartment, Rollison claims that the only reason he had been in the apartment was because he had been told to go check on a guy who was on the upstairs apartment's landing vomiting and in danger of falling off the landing. According to Rollison, the lights were on and

while the screen door was closed, the front door had been open, "[s]o we walked into the house, Eddie went back towards the bathroom, I went to the living room." When they could not find anyone there, they decided to leave, which was when the Drakes and Amy walked into the apartment.

**{¶27}** However, even if an accused offers an innocent explanation for his conduct, "a jury is not required to accept a competing inference of innocence if it may infer guilt, beyond a reasonable doubt, from the same circumstances." *State v. Levingston* (1995), 106 Ohio App.3d 433, 437, 666 N.E.2d 312 (jury not required to accept defendant's explanation that he was looking for a place to get warm, to sleep, and to think). See, also, *State v. Ridgway*, 4th Dist. No. 02CA20, 2003-Ohio-1152, ¶18 (jury not required to accept defendant's explanation that he was looking for a bathroom); *State v. Tierney*, 8th Dist. No. 78847, 2002-Ohio-2607 (same); *State v. Flowers* (1984), 16 Ohio App.3d 313, 315, 475 N.E.2d 790, overruled on other grounds by *State v. Fontes* (2000), 87 Ohio St.3d 527, 721 N.E.2d 1037 (jury not required to accept defendant's explanation that he entered dwelling to commit voyeurism); *State v. Morris*, 4th Dist. No. 04CA7, 2005-Ohio-962, ¶20.  The record also contains evidence that Rollison was discovered walking out from one of the Drakes' rooms carrying Ryan's VCR under his arm.  While we acknowledge that there was conflicting testimony regarding whether the VCR was in Rollison's possession when he was discovered, or whether it had been placed on

the floor across the room; nevertheless, there is evidence that a bag containing Ben's personal belongings was leaning next to the front door. Moreover, both the VCR and the bag containing Ben's personal belongings had been in different locations in the apartment prior to the Drakes leaving for the hospital. In addition, there was testimony that when the Drakes returned from the hospital, they found their apartment in a completely different condition as when they had left – couch and chair cushions were pulled off, and many of their personal items were thrown all over the apartment and were knocked over from their original locations. Furthermore, despite Eddie's testimony claiming that he had been the one that had stolen Ryan's personal belongings, and that Rollison had nothing to do with it, both Carrie Grigsby and Steve Erwin Jr. testified that they had observed both Eddie and Rollison come out of the Drakes' apartment carrying "stuff" into the downstairs apartment. Carrie Grigsby even testified that Rollison had been carrying a camouflage looking notebook under his arm, which corresponded to Ben's testimony that Ryan's missing laptop had a special camouflage skin around it.

{¶28} Ultimately, the jury was not required to accept Rollison's explanation for his conduct and it could rely on circumstantial evidence and all reasonable inferences arising there from in arriving at its verdict. *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus,

superseded by state constitutional amendment on other grounds in *State v. Smith* (1997), 80 Ohio St.3d 89, 684 N.E.2d 668. And given the above evidence, we cannot find that the jury lost its way in finding that Rollison had the intent to commit a criminal act in the Drakes' apartment.

{¶29} Overall, based on our review of the record, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that Rollison's conviction must be reversed and a new trial granted on the burglary charge.

{¶30} Rollison's first assignment of error is, therefore, overruled.

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ADMITTING TESTIMONY ABOUT AN ALLEGED ASSAULT BY DEFENDANT-APPELLANT.**

{¶31} In his second assignment of error, Rollison claims that the trial court abused its discretion when it allowed Ryan Drake to testify about an alleged assault committed by Rollison, even though Ryan did not personally witness the assault. Rollison claims that this testimony was inadmissible hearsay, irrelevant, and unfairly prejudicial.

{¶32} To begin with, the admissibility of relevant evidence rests within the sound discretion of the trial court. *City of Columbus v. Taylor* (1988), 39 Ohio St.3d 162, 164, 529 N.E.2d 1382, citing *Calderon v. Sharkey* (1982), 70 Ohio

St.2d 218, 436 N.E.2d 1008.  Absent an abuse of discretion, as well as a showing that the appellant suffered material prejudice, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence.  *State v. Martin* (1985), 19 Ohio St.3d 122, 129, 483 N.E.2d 1157.  An abuse of discretion implies that the court's decision was unreasonable, arbitrary, or unconscionable, and not merely an error of law or judgment.  *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶130, citations omitted.  When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court.  *State v. Herring* (2002), 94 Ohio St.3d 246, 255, 762 N.E.2d 940.

{¶33} Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," and is generally inadmissible.  Evid.R. 801(c).  Here, Rollison claims that the following statement made by Ryan, over an objection by defense counsel, constituted inadmissible hearsay.  When asked whether he had asked Rollison or Eddie to leave the apartment prior to the fight starting, Ryan responded, "They all three were drinking with me and then, after I came back and when, like the whole thing was happening, like, Rollison hit – that's how John LaRue got his mark because Rollison was hitting people too."  (Drake Depo. at 80).  Later, Ryan admitted that he did not have personal knowledge of whether Rollison had been the one that had hit Jonathan, but that he had heard it from

someone else. (Id. at 80). Rollison claims that the statement that he had hit Jonathan was inadmissible hearsay, that it was irrelevant and unfairly prejudicial, and that it should have been excluded at trial. We disagree.

**{¶34}** Statements only constitute hearsay if they are offered to prove the truth of the matter asserted in those statements – here, that Rollison had been the one that had assaulted Jonathan LaRue. If the statement is offered for some other purpose, then it is not considered inadmissible hearsay. *State v. Twitty*, 2nd Dist. No. 18749, 2002-Ohio-5595, ¶19, citing *State v. Davis* (1991), 62 Ohio St.3d 326, 344, 581 N.E.2d 1362. Here, the State claims, and we agree, that the statement was not offered for the truth of the matter asserted (that Rollison assaulted Jonathan LaRue), but rather to illustrate the events that led to Ryan having to go to the hospital, thereby leaving the apartment unattended. We also note that Jonathan's testimony at trial clarified any discrepancies regarding the fight since he made it very clear that it had been Bobby, not Rollison, who had hit him at the party that night. As a result of the above reasoning, we find that Rollison has not suffered prejudice from the admission of this testimony.

**{¶35}** Therefore, Rollison's second assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. III

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ADMITTING PHOTOGRAPHS OF THE INJURIES TO RYAN DRAKE AND JONATHAN LARUE.**

{¶36} In his third assignment of error, Rollison claims that the trial court abused its discretion when it allowed photographs of Ryan and Jonathan's injuries into evidence. Rollison argues that the photographs were irrelevant, and even if they were relevant, their probative value was substantially outweighed by the danger of their prejudicial effect.

{¶37} Under Evid.R. 403, the admission of photographs rests within the sound discretion of the trial court, and this Court will not disturb a trial court's ruling absent an abuse of discretion. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶95; *Taylor*, 39 Ohio St.3d at 164, citing *Calderon v. Sharkey* (1982), 70 Ohio St.2d 218, 436 N.E.2d 1008; *Martin*, 19 Ohio St.3d at 129. A photograph is admissible if it is relevant and is properly authenticated. *State v. Hill* (1967), 12 Ohio St.2d 88, 90, 232 N.E.2d 394; *Cincinnati, Hamilton & Dayton Ry. Co. v. DeOnzo* (1912), 87 Ohio St. 109, 100 N.E. 320; *State v. McCray* (June 21, 2000), 3d Dist. No. 4-99-15, at *3.

{¶38} Out of all of the photographs admitted into evidence, Rollison only argues that the photographs of Ryan's and his friend Jonathan's injuries were irrelevant and should have been excluded. The State responds by arguing that the photographs were relevant to show that it was necessary for Ryan to go to the hospital and that Rollison had been present when the injuries occurred. While we agree that these photographs corroborated Ryan's version of events, we believe

that the relevancy of these photographs to Rollison's case was extremely limited given the fact that its purpose went to corroborate an otherwise undisputed fact. Despite the limited relevancy of the photographs, assuming that the trial court did abuse its discretion in admitting the photographs into evidence, we nonetheless find that any error would have been harmless given that the admission of the photographs was merely cumulative to other evidence that had been introduced at trial. There were several witnesses who testified that there had been a fight at the Drakes' party that night, and that as a result of the fight, the Drakes left their apartment and went to the hospital for a few hours. Furthermore, we also find that any prejudicial error that the photographs may have caused with respect to the intimidation of a witness charge would have also been harmless given the fact that the jury ultimately found Rollison not guilty of that offense.

{¶39} Rollison's third assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. IV

**THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ADMITTING TEXT MESSAGE HEARSAY.**

{¶40} In his fourth assignment of error, Rollison argues that the trial court abused its discretion when it admitted text message hearsay into evidence. In particular, Rollison claims that the trial court erred in allowing Ryan to testify, over defense objection, that he received a text message from his friend Danny

Cook confirming that the police had left and that he had locked the door. (Drake Depo. at 16). Danny Cook did not testify at trial, the State never offered the actual text message into evidence, and Ryan later admitted that the text message was never sent to his cell phone because his cell phone had been stolen that night. Rollison argues that this statement about the text message was inadmissible because it was offered for the truth of the matter asserted, and since it was improper hearsay, its admission constituted error. The State responds only by stating that the statement had just been cumulative to Officer Cox's testimony concerning the state of the apartment when he had left the scene.

{¶41} We agree that the statement was hearsay and should have been ruled inadmissible. The State has not offered, and we can find no other reason for the admission of the statement concerning the text message, other than offering it to prove the truth of the matter asserted: that the Drakes' front door was locked after they had left for the hospital. Nevertheless, Officer Cox testified that he believed the door had been shut and the lights had been off in the Drakes' apartment when he had left the scene, and the photographs he took of the outside of the house after the assault incident correspond and corroborate his testimony. Furthermore, we note that Ryan was successfully impeached when he admitted that his phone had been stolen that night, so the text message could not have been sent to his phone. Without testifying about the text message itself, Ryan would not have admitted

that the text message could not have been sent to his phone since it had been stolen. As a result of this admission, Ryan's credibility was placed in question and may have been beneficial to the defense. Therefore, we find that any error that had occurred from the admission of the hearsay statement was harmless. *State v. Davis*, 8th Dist. No. 22724, 2005-Ohio-6224, ¶15 (finding that even if the trial court had erred in allowing hearsay testimony, any error was harmless because the testimony was cumulative of other evidence that the Appellant had struck the victim over the head with a hammer).

{¶42} Therefore, even though we find that the statement was hearsay and should have been ruled inadmissible, because it was cumulative in nature, and possibly helpful to the defense, any error that occurred was harmless.

{¶43} Rollison's fourth assignment of error is, therefore, overruled.

### ASSIGNMENT OF ERROR NO. V

**PROSECUTORIAL MISCONDUCT RENDERED DEFENDANT-APPELLANT'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF THE CONSTITUTIONS OF OHIO AND THE UNITED STATES.**

{¶44} In his fifth assignment of error, Rollison argues that certain statements made during the State's closing argument amounted to prosecutorial misconduct and constitute reversible error.

{¶45} "The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the

accused. The touchstone of analysis is the fairness of the trial, not the culpability of the prosecutor." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300 (internal citations omitted). In opening statements and closing arguments, prosecutors are entitled to some latitude regarding what the evidence has shown and the inferences that can be drawn. *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369. When determining whether a prosecutor's comments amounted to prosecutorial misconduct, an appellate court should consider several factors in making this determination: "(1) the nature of the remarks, (2) whether an objection was made by counsel, (3) whether corrective instructions were given by the court, and (4) the strength of the evidence against the defendant." *State v. Braxton* (1995), 102 Ohio App.3d 28, 41, 656 N.E.2d 970. The reviewing court should also ask whether the misconduct was an isolated incident in an otherwise properly tried case. Id. A prosecutor's misconduct will not be considered grounds for reversal unless the misconduct has deprived the defendant of a fair trial. Id.

{¶46} Specifically, Rollison claims that the prosecutor's argument was improper in three instances. First, Rollison claims that the prosecutor argued to the jury that Rollison had a burden to prove his innocence to the police, and second, Rollison claims that the prosecutor improperly implied that the jury should convict him because "[t]hat's the kind of guy we're dealing with." (Nov. 4, 2009

Tr. at 323-24).  Finally, Rollison argues that the prosecutor then urged the jury to convict him because of his prior conduct:

> **On top of that, he had 10 theft offenses.  Now, I don't know about you, but I don't know that many people that are 24 years old and have 10 theft offenses.  I mean, most people don't have any.  There's some people out there who have one, maybe even two.  They made a mistake.  They shoplifted something.  But 10 by 24?**

(Nov. 4, 2009 Tr. at 324).

{¶47} Overall, despite Rollison's assertions, we do not believe that the prosecutor's comments amounted to prosecutorial misconduct.  A prosecutor is afforded wide latitude in closing argument, and closing remarks must be viewed in their entirety to determine whether the disputed remarks were unfairly prejudicial. *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, citing *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 263 N.E.2d 773.  With respect to the first and second alleged inappropriate comments, we note that Rollison failed to object to these alleged instances of misconduct; therefore, he has waived all but plain error.  See Crim.R. 52(B).  Plain error occurs if, but for the error, the outcome of the trial would have been different.  *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225.  Given the evidence and our resolution of the first assignment of error, we find no plain error occurred from the prosecutor's statements during closing.  Absent the statements, there is little possibility that the outcome would have been otherwise.

{¶48} Nevertheless, we agree that the prosecutor's last comment with respect to Rollison's prior theft offenses was improper. While the parties are given great leeway in closing argument, certain conduct, such as issuing a personal opinion and attacking the defendant's character, is not acceptable. *State v. Keenan* (1993), 66 Ohio St.3d 402, 613 N.E.2d 203. However, once conduct is determined to be improper, the reviewing court must consider the effect of the conduct on the jury in the context of the entire trial and determine if the remarks actually prejudiced the substantial rights of the defendant. *State v. Ross*, 2nd Dist. No. 22958, 2010-Ohio-843, ¶107, citing *State v. Wharton*, 9th Dist. No. 23300, 2007-Ohio-1817, ¶16. Here, even though the defense objected and asked for a mistrial based on the comment regarding Rollison's prior theft offenses, the trial court gave the jury a curative instruction and told them that "the matter of whether the Defendant has prior theft offenses. It can only be considered in regard to the Defendant's credibility as a witness, but is not to be otherwise considered by the jury in regard to the matter of the Defendant's guilt." (Nov. 4, 2009 Tr. at 325). Given the trial court's admonition to the jury, and most importantly, based on our prior manifest weight discussion and the strength of the evidence against Rollison, we cannot find that even if the prosecutor's comments were improper, that they prejudicially affected any of Rollison's substantial rights.

{¶49} Therefore, Rollison's fifth assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. VI

**THE COMBINATION OF THE AFOREMENTIONED ERRORS ARE SUFFICIENT TO CALL INTO QUESTION THE VALIDITY OF THE VERDICT, PREVENTING THE APPELLANT FROM OBTAINING THE FAIR TRIAL GUARANTEED BY THE FIFTH AND SIXTH AMENDMENTS TO THE U.S. CONSTITUTION AS MADE APPLICABLE TO THE STATES BY THE FOURTEENTH AMENDMENT, AND ARTICLE ONE, SECTION TEN AND SIXTEEN OF THE OHIO CONSTITUTION.**

{¶50} In his sixth assignment of error, Rollison claims despite the fact that each of the single instances above may not have been individually enough to constitute cause of reversal, he argues that the combination of all of the above errors deprived him of his constitutional right to a fair trial. We acknowledge that the law provides that when multiple harmless errors are considered together, their combined effect may violate a defendant's right to a fair trial. *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623. Nevertheless, "there can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hasting* (1983), 461 U.S. 499, 508-09, 103 S.Ct. 1974, 76 L.Ed.2d 96. Here, the record demonstrates that Rollison was not denied a fair trial. Two of the errors that we found above were the admission of the photographs and the statement concerning the text message. Given the fact that these pieces of evidence were harmless because they were cumulative to other evidence admitted at trial, we cannot say that their harmless effect considered

together would be sufficient to constitute cause for reversal. Moreover, despite the prosecutor's inappropriate comment concerning Rollison's prior theft offenses, the trial court gave a curative instruction to the jury that it could only consider the theft offenses for impeachment purposes. Plus, and most importantly, given the strength of the evidence against Rollison, this Court cannot find that the prosecutor's conduct prejudicially affected Rollison.

{¶51} Rollison's sixth assignment of error is, therefore, overruled.

{¶52} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

*Judgment Affirmed*

**ROGERS and SHAW, J.J., concur.**

**/jlr**