[Cite as *State v. Conley*, 2021-Ohio-2638.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

        PLAINTIFF-APPELLEE,

        v.

SHAWN M. CONLEY,

        DEFENDANT-APPELLANT.

CASE NO. 8-20-55

**O P I N I O N**

Appeal from Logan County Common Pleas Court
Trial Court No. CR 19 08 0233

**Judgment Affirmed**

**Date of Decision:  August 2, 2021**

APPEARANCES:

    *William T. Cramer* for Appellant

    *Alice Robinson-Bond* for Appellee

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Shawn Conley ("Conley") brings this appeal from the judgment of the Court of Common Pleas of Logan County convicting Conley of one count of menacing by stalking. Conley claims on appeal that the trial court erred 1) by admitting evidence of prior bad acts; 2) that his conviction was not supported by sufficient evidence; and 3) the conviction was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} On August 13, 2019, the Logan County Grand Jury indicted Conley on one count of menacing by stalking in violation of R.C. 2903.211(A)(1), (B)(2)(d), a felony of the fourth degree, and one count of menacing by stalking in violation of R.C. 2903.11(A)(1), (B)(2)(e), a felony of the fourth degree. Doc. 6. Conley entered pleas of not guilty to both counts. Doc. 14. Before trial, Conley filed a motion in limine to restrict admission of his prior bad acts and mention of the civil protection order ("CPO"). Doc. 163. On August 11, 2020, the trial court granted the motion in limine as to the civil protection order, but denied it as to the prior bad acts. Doc. 168.

{¶3} A jury trial was held on August 12 and 13, 2020. Doc. 180. During the trial, the following evidence was presented. Kristen Conley ("Kristen") testified that she was Conley's ex-wife. Tr. 35. Kristen testified that on November 20, 2018, Conley had grabbed her wrists and shoved her against the counter, resulting in a new tattoo bleeding, marks, and bruises. Tr. 36. She chose not to press charges

because Conley indicated he would get "help". Tr. 37. Kristen also testified that Conley had struck her daughter on her hip leaving a bruise in 2019. Tr. 38. On cross-examination, Kristen admitted that charges were filed against Conley for when he grabbed her wrist leaving a mark, but he was not convicted. Tr. 45. She also admitted the injury to her daughter was the result of Conley disciplining the child by spanking. Tr. 48. When asked, Kristen admitted that she did not believe Conley was dangerous. Tr. 49.

{¶4} Frederick Otterbein ("Otterbein") testified that he is the district asset protection manager for Kroger and had worked for Kroger for 42 years. Tr. 55. Otterbein testified that there is security video in the stores, but no audio. Tr. 56. He identified Exhibit 1 as security footage from the Kroger checkout. Tr. 66. He also identified Exhibit 2 as security footage from the Kroger liquor department. Tr. 66.

{¶5} C.B., the victim, testified that in October of 2018, she was sixteen years of age. Tr. 76. At that time, she worked part time at the Kroger store in Bellefontaine as a cashier. Tr. 77. C.B. first met Conley two weeks after she started working at Kroger. Tr. 78. The first time she met him she was checking out his groceries and he started talking to her about an injury she had to her wrist which required her to wear a brace. Tr. 79. When C.B. handed the receipt to Conley, he grabbed her wrist and told her to keep the boys away from her. Tr. 79. C.B. thought this was a strange thing to say. Tr. 80. Another time, C.B. was wearing a necklace, which had a picture of her and her boyfriend in it. Tr. 80. Conley asked her who

he was and when she told him it was her boyfriend, he told her to make sure the boyfriend treated her right. Tr. 80. These interactions made C.B. feel uncomfortable. Tr. 81. Conley would make it a point to come through her line and it made her uncomfortable enough that she reported it to her manager. Tr. 81.

{¶6} One incident involved Conley going to the self-checkout with one item. Tr. 82. When he saw C.B. come back from her break to work a register, he left the self-checkout and got into her line behind other people. Tr. 82. Conley overheard another worker make a comment about C.B. and her brother-in-law and became angry. Tr. 84. Conley told her bagger to make sure to keep the boys away from her and to protect her. Tr. 85. When Conley would pay for items with cash, his hand would linger on C.B.'s or he would try to grab her hands. Tr. 86. C.B. told her coworkers about this behavior and they would try to help her avoid Conley. Tr. 86. When coworkers saw him approaching her register, they would send her on break or send her to stock shelves so she would not be interacting with him. Tr. 86. After Conley's comment to the bagger, management decided to remove her from the floor when he came into the store. Tr. 87. This occurred 20-30 times between October 2018 and June 2019. Tr, 87. On one occasion, she had to wait approximately an hour and a half because Conley saw her going on break and waited for her to come back. Tr. 88. When she came down from the break with the manager escorting her after that amount of time, she saw Conley still in the store with only a few random items. Tr. 89.

{¶7} On June 12, 2019, C.B. was helping bag for another cashier. Tr. 89, 91. Conley came in the exit doors, pinched her bra strap, and then continued to try and have a conversation with C.B. Tr. 90. The State then showed a video of this incident from Exhibit 1. Tr. 90. Conley told C.B. that he had seen her the previous day in her father's truck. Tr. 91. This encounter caused C.B. to be worried and become shaky. Tr. 91-92. A coworker then came over to take her place and told her to go hide so that Conley could not get to her. Tr. 92.

{¶8} On another occasion, C.B. was waiting in her car to go in the store and clock in because she was early. Tr. 94. C.B. felt like someone was watching her and looked in her mirror. Tr. 94. Conley was standing behind her car smoking a cigarette. Tr. 94. When C.B. got out of the car, Conley started asking her about her future plans and tried to give her a hug. Tr. 94. C.B. testified that she put her head down and kept walking. Tr. 94. On other occasions, Conley would follow C.B. into the parking lot when her shift was over. Tr. 96. C.B. testified that on multiple occasions, Conley's car would be parked next to hers, regardless of which vehicle she had driven. Tr. 96. In the two months before she obtained the restraining order, this was happening almost every time she worked. Tr. 97.

{¶9} C.B. testified that one day she was going to a nail appointment. Tr. 97. Conley saw her and stopped his vehicle in an intersection in front of her and tried to have a conversation with her. Tr. 97-98. C.B. rolled up her window and ignored

him. Tr. 98. She could not pull away because he was blocking her path. Tr. 98. This interaction made C.B. fearful because it was close to her home. Tr. 98.

{¶10} C.B. testified that in most of the encounters, she just tried to ignore Conley. Tr. 99. She would brush off the conversation and focus on his groceries. Tr. 99. Sometimes when she did not acknowledge him, Conley would comment that she did not seem happy or tell her to smile more. Tr. 99. Eventually her coworkers would intervene to allow her to get away from him. Tr. 100. The male coworkers would walk her to her car at night to protect her in case he was out there waiting for her. Tr. 100. C.B. testified that when Conley came into store, her hands would start shaking and she would start feeling nauseous. Tr. 100. C.B. testified that instead of going directly home from work, she would take different routes to avoid being followed. Tr. 101. Eventually her fear led to her family purchasing a security system for the home. Tr. 101. C.B. would constantly be checking over her shoulder in public and developed a fear of going to large events because Conley might be in the crowd. Tr. 101. C.B. was also concerned that Conley might do something to her sisters. Tr. 102. Additionally, the stress of this caused her father to lose weight and start tracking her phone to know where she was. Tr. 102. C.B. even picked a college farther away from home to get away from Conley. Tr. 105. C.B. testified that Conley should have known that his attentions were unwanted because she was purposely being pulled from the register every time he came in the store and she refused to speak with him. Tr. 105.

{¶11} On cross-examination C.B. testified that she became uncomfortable with Conley about two weeks after she first met him. Tr. 107. C.B. admitted that her grades were not affected much. Tr. 109. C.B. did not seek a CPO until June of 2019. Tr. 114. C.B. admitted that she never told Conley to leave her alone and never asked a coworker to tell Conley to leave her alone. Tr. 115. C.B. claimed that she did not really discuss the issue with her family for several months because she thought they would think she was overreacting. Tr. 121.

{¶12} T.B. testified that she is C.B.'s mother. Tr. 144. T.B. noticed that C.B. had changed her personality as she was frequently looking over her shoulder and did not want to go places alone. Tr. 145. On cross-examination, T.B. testified that the tracker on the phone was not new, that it had always been there. Tr. 150. The tracker was how T.B. noticed that C.B. was taking various routes home from work. Tr. 150.

{¶13} Ch.B. testified that he is C.B.'s father. Tr. 156. He testified that before this, C.B. was a carefree child, but since this started she is isolated and does not like to go out in public. Tr. 156. Ch.B. indicated that he has lost 10-15 pounds due to the stress from worrying about C.B. Tr. 157-58. Ch.B. admitted on cross-examination that there have been no violations of the CPO. Tr. 160.

{¶14} Julie Litton ("Litton") testified that she was the store manager at Kroger's in Bellefontaine during the time in question. Tr. 166. When C.B.'s supervisor informed Litton that C.B. was afraid of Conley, she came up with a

procedure to protect C.B. Tr. 167. When Conley came into the store, C.B. was to go to the manager's office in the upstairs of the building. Tr. 167. This happened four different times when Litton was present. Tr. 167. Litton watched Conley when he was in the store and noted that he was "just roaming, not really shopping", that he appeared to be just watching C.B. Tr. 168. Litton did not speak with Conley about his actions, but did contact the loss prevention team. Tr. 168. Litton did approach Conley once and ask if she could help him. Tr. 169. He said no and said he was there with his mother. Tr. 169. Litton testified that when Conley came into the store, C.B. would become terrified. Tr. 170. Litton tried to help the situation by having a staff member walk C.B. to her car. Tr. 171. On cross-examination Litton admitted that they started watching for Conley because of C.B. reporting she was very uncomfortable. Tr. 174. She did not have Conley removed from the store because she thought that was the job of loss prevention or the police. Tr. 178.

{¶15} Ryan Althouse ("Althouse") testified that he is the customer service coordinator at Kroger in Bellefontaine. Tr. 183. He was one of C.B.'s supervisors. Tr. 184. When Althouse's supervisor learned what was happening, she told him to remove C.B. from the floor when Conley entered the store until the issue was resolved. Tr. 185. The process involved pulling C.B. from the register and the sales floor until Conley had left the store. Tr. 186. C.B. was taken to any area in the store that was not open to the general public. Tr. 186. This was probably done five to ten times before C.B.'s parents and the police became involved. Tr. 187. Once C.B.

was removed from the sales floor, Althouse would watch to see when Conley would leave. Tr. 188. Althouse noticed that Conley would pace up near the entrance by the registers to see if C.B. was back yet. Tr. 188. One time C.B. was on register and they missed seeing Conley. Tr. 188-89. Conley got in C.B.'s line, so they sent another employee over to take her place. Tr. 189. When these instances occurred, C.B. would get upset and frustrated. Tr. 190. Althouse testified that her facial expressions made it clear that she was upset. Tr. 190. When Conley touched C.B.'s back, C.B. immediately came into the office with Althouse and looked visibly distraught. Tr. 191. Althouse testified that no one from Kroger got involved because it is Kroger's policy to defuse the situation until law enforcement is involved. Tr. 191-92. Althouse admitted on cross-examination that after the CPO was issued, Conley has not been back to the store. Tr. 193. According to Althouse, he first spoke with C.B. about what was happening in late May or early June 2019. Tr. 195. Althouse has seen Conley speaking with other employees and customers with no complaints from them. Tr. 195. Before May of 2019, Althouse had not seen C.B. be removed from the sales floor due to Conley's arrival. Tr. 197.

{¶16} Andrew Abraham ("Abraham") testified that he was a front end associate at Kroger for two years. Tr. 204. This job required him to supervise the breaks for people and direct the cashiers. Tr. 205. Abraham testified that in winter of 2019 he was instructed to start hiding C.B. every time Conley came into the store. Tr. 206. Abraham noted that Conley seemed to pick C.B.'s register and then he

would send someone over to take her place. Tr. 207. Abraham recalled that C.B. acted distressed when Conley would come in the store. Tr. 208. She would become nervous and her face would "go white." Tr. 208. Abraham testified that on occasion, Conley would come into the store and then leave with no purchases. Tr. 211.

{¶17} Blake Baughman ("Baughman") testified that he worked at Kroger from May 2018 until March 2020. Tr. 216. Baughman performed the tasks of bagging, stocking shelves, and cashier. Tr. 217. After Baughman became aware of who Conley was and that he was bothering C.B., he started noticing him. Tr. 217. Baughman noted that Conley came in the store more than usual and would spend an hour and a half there, only picking up four or five items. Tr. 217. This happened on the days that C.B. was working. Tr. 218. Conley always went to where C.B. was stationed. Tr. 218. When Conley was ready to check out, he always went for C.B.'s lane rather than a random one. Tr. 219. Conley would attempt to make small talk with C.B. before he would leave. Tr. 219. This would occur even if the other lanes had shorter lines, choosing to wait 10-15 minutes instead. Tr. 219. Baughman testified in either December 2018 or January 2019, Conley came up to him outside Kroger and asked him where the "tall girl that works up front lives". Tr. 220. Baughman assumed he was talking about C.B. Tr. 220. In June of 2019, Baughman saw C.B. come in to clock in for her shift. Tr. 223. C.B. was shaking and claimed that Conley had come up to her car in the parking lot. Tr. 223. Although Baughman

did not see it happen, he testified that C.B. looked shocked and nervous. Tr. 224. On cross-examination, Baughman admitted that he was only "90%" sure the man who approached him to ask about the tall girl was Conley or that he was referring to C.B. Tr. 225. Baughman learned about the situation when C.B. told him in December 2018. Tr. 226. When C.B. told him, Baughman told her to talk to the manager. Tr. 226. Baughman admitted that he had never personally seen Conley approach C.B. Tr. 229.

{¶18} Jimmy Elkins ("Elkins") testified that he worked as the store recruiter and manager on duty for the Kroger store in Bellefontaine. Tr. 233. Elkins' daughter is married to Conley's brother, so he knows who Conley is. Tr. 234. Elkins first became aware of the issue when Baughman pointed Conley out to him as the man who was "stalking" C.B. Tr. 235. As the manager on duty, Elkins noticed several times that Conley went to C.B.'s line. Tr. 235. After speaking with Litton, Elkins was instructed to remove C.B. from the floor any time Conley got in her line. Tr. 236. Elkins remembered this occurring two or three times. Tr. 236. Every time Elkins saw Conley in the store, he went for C.B.'s line even though there were several lanes open. Tr. 236. When he would remove C.B., she would look frightened. Tr. 236. At the end of C.B.'s shift, Elkins, Baughman or Althouse would walk her to her car in case Conley was in the parking lot. Tr. 236. Elkins indicated on cross-examination that he informed Litton of the issue the day after he was told. Tr. 238. Elkins denied telling Litton about Conley's criminal past at that

time, but did tell her later. Tr. 239. Elkins also told C.B. about Conley's past when she told him about him following her in her car. Tr. 240. Elkins admitted that Conley had not come into the store since the CPO was issued. Tr. 248.

{¶19} Debbie Headley ("Headley") testified that she had worked at Kroger during the time at issue in this case. Tr. 261. On June 12, 2019, Headley was working in the liquor department. Tr. 261. Headley identified Exhibit 2 as a video of an interaction she had with Conley on that day. Tr. 263. Headley testified that Conley came in the liquor department agitated and wanted to write down his phone number for C.B. Tr. 264-65. Conley had told Headley that he knew where C.B. lived, what vehicles she drove, and what time she got off work. Tr. 266. Conley wanted to give C.B. his number so that he would not have to wait outside until she got off work at 10:00. Tr. 266. Headley testified that Conley was agitated because he did not think C.B.'s boyfriend was good enough for her and wanted to show her what a "real man" was like. Tr. 267. When Conley left her department, Headley called the manager to warn them because she was concerned about C.B. Tr. 269.

{¶20} Andy Loehr ("Loehr") of the Bellefontaine Police Department investigated the complaint that T.B. made to the police. Tr. 277, 279. Loehr attempted to make contact with Conley, but was unable to do so. Tr. 280. While C.B. was telling him what had happened, she became more nervous and started to slump in her seat. Tr. 281. The first time he was able to speak with Conley was at the hearing on the CPO. Tr. 283. Loehr admitted on cross-examination that no one

had communicated directly with Conley that he needed to stop his behavior.  Tr. 288.  Since the CPO has been issued, Conley has complied with it.  Tr. 288.

{¶21} Detective Brent Joseph ("Joseph") of the Logan County Sheriff's Office testified that he knew Conley from an aggravated burglary case he investigated  in 2004 where Conley admitted breaking into the home of a 17 year old victim and scaring her by coming into her bedroom wearing a mask and gloves while holding what appeared to be a pistol.  Tr. 290-293.  When Conley heard her scream and saw her on the phone, he fled from the scene.  Tr. 293.  On cross-examination, Joseph admitted that Conley was 18 or 19 years old at that time.  Tr. 294.  Although Conley avoided answering the questions at the beginning, he soon gave an accurate statement of what happened.  Tr. 295.  Joseph admitted that in his opinion, Conley was honest with him about what had happened.  Tr. 295.  Joseph also admitted that Conley's maturity at that time was that of an average 18 or 19 year old "boy".  Tr. 296.

{¶22} At the conclusion of the trial, the jury returned verdicts of guilty on both counts.  Doc. 180.  The trial court held a sentencing hearing on September 17, 2020.  Doc. 187.  At the hearing, the trial court determined that the two menacing by stalking counts were allied offenses and the State chose to proceed to sentencing on Count 2.  Doc. 187.  The trial court sentenced Conley to serve a prison term of 18 months in prison.  Doc. 187.  Conley filed a timely notice of appeal.  Doc. 200.  On appeal, Conley raises the following assignments of error.

**First Assignment of Error**

**The trial court abused its discretion in admitting evidence of [Conley's] prior acts of violence.**

**Second Assignment of Error**

**Conley's due process rights were violated by a conviction for menacing by stalking that was not supported by sufficient evidence.**

**Third Assignment of Error**

**Conley's conviction for menacing by stalking was not supported by the weight of the evidence.**

*Admission of Evidence*

{¶23} In the first assignment of error Conley claims that the trial court erred by admitting evidence of his prior acts of violence. Generally the admissibility of other acts evidence rests within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of the discretion that created material prejudice. *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14 and *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66. "An abuse of discretion exists when a decision is unreasonable, arbitrary, or unconscionable." *State ex rel. Sales v. Ohio Public Employees Retirement Board*, 156 Ohio St.3d 433, 2019-Ohio-1568, 128 N.E.3d 216, ¶ 15. "Absent an abuse of discretion, as well as a showing that the appellant suffered material prejudice, an appellate court will not disturb a trial court's ruling as to the admissibility of evidence." *State v. Rollison,* 3d Dist. Marion No. 9-09-51, 2010-Ohio-2162, ¶

32. "When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court." *Id.*

{¶24} Conley claims that the trial court erred by admitting evidence of his prior violent acts. Generally, all relevant evidence is admissible. Evid.R. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. Relevant evidence must be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). Although evidence of other crimes, wrongs, or acts generally are not admissible to show the character of a person, they may be admitted for other purposes. Evid. R. 404(B). This Court notes that one of the elements to be proven by the State in Count 2 of the indictment is that the "offender has a history of violence toward the victim or any other person or a history of other violent acts toward the victim or any other person." R.C. 2903.211(B)(2)(e). Since evidence of a history of violent acts towards a person is required to prove the menacing by stalking offense as set forth in Count 2, the trial court did not abuse its discretion by allowing it to be admitted in this case. The first assignment of error is overruled.

*Sufficiency of the Evidence*

{¶25} In the second assignment of error, Conley claims that the conviction was not supported by sufficient evidence. The question of whether the evidence

presented at trial is legally sufficient to support a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. Sufficiency is basically a term of adequacy. *Id*.

> **An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. * * * Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." * * * "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact."**

*State v. Adkins*, 3d Dist. Allen No. 1-19-71, 2020-Ohio-6799, ¶ 37 (citations omitted).

**{¶26}** The jury convicted Conley of two counts of Menacing by Stalking. Count 1 was merged into Count 2 at the sentencing hearing. When a conviction is merged with another for the purposes of sentencing, there is no longer a conviction to be vacated, so the sufficiency of the evidence to support the conviction need not be addressed as long as the evidence is sufficient to support the selected conviction. *State v. Turner*, 2nd Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 22. Thus, if the evidence is sufficient to support a conviction under Count 2, this Court need not address the sufficiency of the evidence as to Count 1.

{¶27} The State was required to provide evidence that Conley 1) engaged in a pattern of conduct that 2) would cause mental distress to another person or a family member of that person and 3) that Conley had a history of violent acts towards another person. R.C. 2903.211(A)(1), (B)(2)(e). Many witnesses testified to the pattern of conduct in which Conley engaged and to the effect it had on C.B. Witnesses also testified that Conley should have realized that C.B. did not want his attention by the nonverbal reactions C.B. had and the fact that she repeatedly attempted to avoid him, including refusing to speak with him, refusing to make eye contact with him, pretending she did not see or hear him when outside the store, and immediately leaving the sales floor when Conley would arrive at the store. Testimony was given that Conley had previously broken into the home of another young woman while wearing a mask, gloves, and carrying what looked like a pistol. The victim in that case felt that she had been threatened with violence and was very afraid. Viewing this evidence in a light most favorable to the State, the evidence is sufficient to support the conviction for menacing by stalking as set forth in Count 2. Since the evidence was sufficient to support this conviction, we need not consider the conviction in Count 1. The second assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶28} Conley's final assignment of error claims that the judgment was against the manifest weight of the evidence. When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court

"review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 738 N.E.2d 822 (2000). See, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. 13–12–22, 2013-Ohio-650, ¶ 29.

**{¶29}** In Conley's case, ample testimony was presented as to the effect Conley's behavior had on C.B. C.B. was nervous every time Conley was around, had to hide in the store when he came in, took different routes home to avoid being followed, had to be escorted to her car when she left work, and was frequently looking over her shoulder to make sure Conley was not around. C.B. and her family testified that she felt sick and was more withdrawn since Conley started his behavior of frequently coming in the store and trying to interact with her. C.B. testified that Conley stopped in the middle of an intersection preventing her from driving away while trying to talk to her. Despite her ignoring him and hiding when he came in the store, Conley persisted with his conduct.

{¶30} Conley argues that he lacked the mens rea because he did not know that his attentions were unwanted. For the jury to convict, Conley must have been found to act knowingly. The trial court defined knowingly for the jury as follows.

**A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or be of a certain nature. A person has knowledge of circumstances when the person is aware that the person's conduct will probably cause a certain result or be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist. Because you cannot look into the mind of another, knowledge is determined from all of the facts and circumstances in evidence.**

**You will determine from these facts and circumstances whether or not there exists at the time in the mind of the defendant an awareness of the probability that he would cause [C.B.] to believe that he would cause physical harm to [C.B.] or a family or household member of [C.B.], or cause mental distress to [C.B.] or a family or household member of [C.B.]**

**\* \* \***

**\* \* \* The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's fail – act or failure to act. The defendant is also responsible for the natural and foreseen consequences or results that follow in the ordinary course of events from the act or failure to act.**

Tr. 330-331.

{¶31} Here, the witnesses all admitted that no one at any time told Conley to stay away from C.B. or to leave her alone. All of the witnesses also admit that once the CPO was in place, Conley did not violate it. However, all of this evidence was before the jury and they concluded that Conley knew that his attentions were not

wanted based upon the nonverbal actions taken by C.B. and the fact that every time he came in the store, C.B. was removed from the floor and did not return while he was present, no matter how long he was there. A review of the record before this Court does not show that the jury clearly lost its way, that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice occurred. Thus, the convictions are not against the manifest weight of the evidence. The third assignment of error is overruled.

{¶32} Having found no prejudicial error in the particulars assigned and argued, the judgment of the Court of Common Pleas of Logan County is affirmed.

***Judgment Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/hls**